1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4

5    DOUGLAS TROESTER, on behalf  )
     of himself, and all other    )
6    similarly situated,          )
                                  )
7                      Plaintiff, )
                                  )
8        vs.                      ) Case No.
                                  ) 2:12-cv-07677-GAF-PJW
9                                 )
     STARBUCKS CORPORATION, a     ) Volume I
10   Washington corporation, and  )
     DOES 1-50, Inclusive,        )
11                                )
                       Defendants. )
12   _____)

13

14

15              DEPOSITION OF DOUGLAS R. TROESTER

16                   Los Angeles, California

17                  Wednesday, March 6, 2013

18

19

20

21

22

23

24   Reported by:  Linda D. White
                   CSR No. 12009
25   NDS Job No.:  153830

                                                              1

KNOPP DECL EX A, PAGE 3

1      A.    The pause was I was clarifying in my mind

2    whether unemployment is disability, but I don't

3    believe it is.

4      Q.    No.  I'm not asking --

5      A.    So no.

6      Q.    Okay.  Thank you.  Are you currently

7    employed?

8      A.    No, I am not.

9      Q.    When was the last time you were employed?

10     A.    January of 2011.

11     Q.    And was your last employment with

12   Starbucks?

13     A.    Yes, it was.

14     Q.    You were employed by Starbucks for two

15   distinct periods of time?

16     A.    That is correct.

17     Q.    Most recently you were employed from

18   sometime in 2008 through January 2011; is that

19   right?

20     A.    That is correct.

21     Q.    While you were employed by Starbucks

22   during that period of time, did you have employment

23   with anybody else as well?

24     A.    No.

25     Q.    And previously you were employed by

16

KNOPP DECL EX A, PAGE 4

```
1          THE WITNESS:  Setersh.

2          MS. SCHWARTZKOPF:  Setareh.

3          THE WITNESS:  Pardon me.

4          MS. SCHWARTZKOPF:  S-E-T-A-R-E-H.

5          THE WITNESS:  And Mr. Pfingston asked Shaun to,

6     as a personal favor, listen to my situation with

7     Starbucks to see if we could have any kind of legal

8     advice for the unemployment or any other matter.

9     BY MR. KNOPP:

10         Q.   When you say "unemployment," are you

11    referring to a claim for unemployment benefits that

12    you filed?

13         A.   Yes.

14         Q.   Before meeting with your attorney, did you

15    believe that Starbucks had failed to pay you for

16    time worked?

17         A.   Yes.

18         Q.   When did you first form that belief?

19         A.   During my period of employment with

20    Starbucks.  There would be frequent times I was

21    going throughout the day thinking about, you know,

22    you really -- they're saving quite a bit of money.

23    I remember an exercise I had done a couple of times

24    when I -- I thought about how much money it was

25    that, you know, 5 minutes here, 10 minutes there and
```

36

KNOPP DECL EX A, PAGE 5

1    how much that added -- added up in a year.  It's

2    like, wow, that's pretty amazing.

3         Q.   Are you referring to time worked on

4    closing shifts?

5         A.   Yes.

6         Q.   Are you referring to anything besides

7    that?

8         A.   For my personal self, no.

9         Q.   When did you first consult an attorney?

10        A.   The first time was with the Setareh Law

11   Group.

12        Q.   Do you recall the date or can you

13   approximate?

14        A.   Just in that period.  Probably right in

15   the middle of the period that I was at the

16   domiciliary.

17             Actually, I could probably get a little

18   bit more specific.  Mr. Pfingston accident was in

19   December and he was in the hospital until January.

20   So probably somewhere around February of that --

21   that year.

22        Q.   Which year is this?

23        A.   That would be 2012.

24        Q.   Did you consult any other attorneys

25   besides the attorneys who now represent you?

                                                    37

1        Q.    In what job position?

2        A.    A barista.

3        Q.    Did you accept that offer?

4        A.    Yes, I did.

5        Q.    So when you returned to Starbucks in

6    February 2008, you started working as a barista?

7        A.    That's correct.

8        Q.    In which store?

9        A.    I was slated for the Hollywood Way store,

10   but it was probably a month, maybe a

11   month-and-a-half to be opened.   So they started some

12   retraining with the rest of the crew that was going

13   to move over, in the Enterprise Landing one.

14       Q.    So you started in the Enterprise Landing

15   store?

16       A.    Yes.

17       Q.    For about a month or a month-and-a-half?

18       A.    Yes.

19       Q.    And then you moved to the Hollywood Way

20   store?

21       A.    Yes.

22       Q.    And was the Hollywood Way store your

23   assigned store for the duration of your employment?

24       A.    Yes.

25       Q.    At some in time, you were promoted to

52

KNOPP DECL EX A, PAGE 7

1    shift supervisor?

2         A.   Yes.

3         Q.   Was that in June of 2008?

4         A.   Yes.

5         Q.   And you remained a shift supervisor

6    throughout the re -- remainder of your employment?

7         A.   Yes.

8         Q.   Did you ever seek a promotion above the

9    shift supervisor position?

10        A.   Yes.

11        Q.   What did you do to -- in an effort to get

12   promoted?

13        A.   I con -- contacted the store manager

14   first.  And then she referred me to two sources.

15   One was a hiring fair for managers and then the

16   district manager that was in charge at that time.

17        Q.   Who was the district manager?

18        A.   Christian.  I can't recall his last name.

19        Q.   Did you ever formally apply for a

20   management position?

21        A.   Yes, I did.

22        Q.   In what year?

23        A.   It would have been 2009.

24        Q.   And what became of your application?

25        A.   Christian went through the process of

                                                        53

KNOPP DECL EX A, PAGE 8

1        A.   Yes, it is.

2        Q.   And you signed it on the second page?

3        A.   Yes, I did.

4        Q.   This is a letter that you prepared in

5   connection with an appeal of the denial of your

6   claim for unemployment benefits?

7        A.   That is correct.

8        Q.   Is it fair to say that in this letter you

9   dispute whether your -- your termination from

10  Starbucks was justified?

11       A.   Yes, that's correct.

12       Q.   Are -- are you angry about your

13  termination?

14       A.   No.

15       Q.   Are you upset about it?

16       A.   Upset at the time, yes.

17       Q.   Still?

18       A.   No.

19       Q.   Do you think it was fair?

20       A.   No.

21       Q.   What else do you recall about the meeting

22  at which Ms. Westby informed you of the termination?

23       A.   Simply, very little.

24       Q.   Did she give you any documents?

25       A.   I do believe there was more documents than

71

KNOPP DECL EX A, PAGE 9

1   the one that you showed me.  I think there was some

2   documents signing -- turning over keys possibly.

3   You know, just routine.

4        Q.   Did she give you a paycheck?

5        A.   Yes, she did.

6        Q.   Did the check include the wages you had

7   earned up until that day?

8        A.   In -- other than what I'm disputing is

9   missing, yes.

10       Q.   Okay.  And this meeting occurred on

11   January 6th?

12       A.   Yes.

13       Q.   Did you work a shift that day?

14       A.   Scheduled, but no.

15       Q.   You came to work -- you were on the

16   schedule to work that day?

17       A.   Yes.

18       Q.   And was Ms. Westby there when you arrived?

19       A.   Yes.

20       Q.   And you had the meeting at that point?

21       A.   Yes.

22       Q.   You can -- you can put these documents

23   aside, please.  Thank you.

24       A.   (Witness complies.)

25       Q.   You mentioned that when you first returned

72

1    supervisor?

2         A.   Yes, they did.

3         Q.   You were expected to understand those

4    materials?

5         A.   Absolutely.

6         Q.   And to implement their teachings in

7    performing your job?

8         A.   Yes.

9         Q.   When you were employed by Starbucks in

10   California, were you aware of the avenues you could

11   use to make complaints about things that happened in

12   the workplace?

13        A.   I was aware of Starbucks' methods of

14   handling those procedures.

15        Q.   Okay.  Yeah, that -- that's what I meant.

16        A.   Okay.

17        Q.   You were aware that you could make a

18   complaint about something hap -- happening in the

19   workplace to your store manager, for example?

20        A.   Yes.

21        Q.   And to a district manager?

22        A.   Yes.

23        Q.   Are you familiar with partner resources?

24        A.   Yes, I am.

25        Q.   What is partner resources?

83

**KNOPP DECL EX A, PAGE 11**

1        A.    Partner resources would be considered in

2   business terms the human resource side of Starbucks.

3   Usually that would be handled at a minimum of a

4   district level, but most likely a region level,

5   because there would be several districts under one

6   partner resource group.

7        Q.    Did you understand that you could contact

8   partner resources, if you had an issue?

9        A.    I understood that.

10        Q.    Did you understand how to contact partner

11   resources?

12        A.    Not really well.

13        Q.    Are you aware that there was a phone

14   number posted in the store?

15        A.    The phone number would take us to

16   corporate in Seattle, yes.

17        Q.    There was also a phone number, a 1-800

18   number?

19        A.    As far as I recall it was a 1-800 number.

20        Q.    Do you recall the -- something called the

21   help line?

22        A.    Partner help line, yes.

23        Q.    What do you -- what's your understanding

24   what that is?

25        A.    That was the general corporate number that

84

KNOPP DECL EX A, PAGE 12

1   would take care of virtually any kind of HR function

2   dealing with if you didn't get pay, if you were

3   needing some kind of form for payment or benefits or

4   anything of that.

5        Q.   Do you ever recall every utilizing that

6   phone number for any reason?

7        A.   Oh, yeah, I'm sure, many times.

8        Q.   And were your questions or issues resolved

9   to your satisfaction?

10        A.   For those issues, yes.

11        Q.   Do you recall ever contacting partner

12   resources directly for any reason?

13        A.   Not specifically, but if you could -- go

14   ahead.

15        Q.   I'm sorry.  No, you finish, please.

16        A.   No, I'll stop there.

17        Q.   Okay.  Your answer was finished?

18        A.   Yes.

19        MR. KNOPP:  9, please.

20    (Whereupon Exhibit 9 was marked for identification)

21   BY MR. KNOPP:

22        Q.   Mr. Troester, the reporter has handed you

23   a document that's been marked as Defendants'

24   Exhibit 9.  It is a copy of a Starbucks Partner

25   Guide.

85

**KNOPP DECL EX A, PAGE 13**

1          And I'd like to direct your attention to

2     Page 12 of the document.  If you could just take a

3     minute to read that to yourself, I would appreciate

4     that.

5          A.   (Witness complies.)

6          Q.   Have you had a chance to review Page 12 of

7     the Partner Guide?

8          A.   Yes, I have.

9          Q.   Now, when you were employed by Starbucks,

10    you were responsible for recording all of your hours

11    worked, correct?

12         A.   That is correct.

13         Q.   And how did you do that?

14         A.   The POS system housed the software to take

15    care of punch-ins and punch-outs.

16         Q.   Did you understand that you were required

17    for recording your hours worked so that you could

18    paid for your time?

19         A.   Yes.

20         Q.   And did you always record your hours

21    worked accurately?

22         A.   To the best of ability.

23         Q.   And were you paid for all the time that

24    you recorded in the POS system?

25         A.   Could you clarify that question, please?

86

KNOPP DECL EX A, PAGE 14

1        Q.   Yes.  Were you, in fact, paid for the time

2   you recorded?

3        A.   For the things that went through the POS

4   system, yes.

5        Q.   And as a Starbucks employee, you were also

6   responsible for reviewing your paycheck to ensure

7   that you were being paid the time you worked,

8   correct?

9        A.   That's correct.

10       Q.   Was it your practice to do so?

11       A.   Infrequently, yes.

12       Q.   Are you familiar with something called the

13   Punch Communication Log?

14       A.   Yes.

15       Q.   What is your understanding what that

16   document is?

17       A.   The -- the document was something in a

18   book that gave about three or four lines, that

19   allowed for any employee during a given day that

20   might have missed a punch-in or a punch-out to

21   physically write it in.

22       Q.   So the Punch Communication Log was

23   available to the employees if an error was made in

24   punching in or punching out, correct?

25       A.   That's correct.

87

**KNOPP DECL EX A, PAGE 15**

1      Q.   And it was also available to the employees

2    if for whatever reason they worked time while not

3    clocked in, correct?

4      MS. SCHWARTZKOPF:   Objection.   Lack of

5    foundation.

6          You can answer.

7      THE WITNESS:   The punch log was there, but it

8    was definitely known in the culture to only be for

9    missed punches on the terminal.   The other time the

10   punch log would be used is if you would got to like

11   a training event and you couldn't punch in in your

12   home store.

13         Then they -- the corporation would handle

14   it one or two ways.   They would either say, "Go back

15   and put it in the punch log," or case like -- if

16   it's Marianna Vitali, she had the authority to

17   just -- everybody that went to the training, she

18   would take care of it at her DM level.

19   BY MR. KNOPP:

20      Q.   Did you use the Punch Communication Log?

21      A.   Yes.

22      Q.   When you used the Punch Communication Log,

23   were you paid for any time that you recorded on the

24   log?

25      A.   Yes.

88

1        MR. KNOPP:  I got six documents here.  Could

2    you mark them as 9 through 14, please?

3        MS. SCHWARTZKOPF:  I think we're on 10.

4        MR. KNOPP:  Oh, I'm sorry.  10 through 15.

5    Thank you.

6        (Whereupon Exhibits 10 through 15 were marked for

7                     identification)

8    BY MR. KNOPP:

9        Q.   Mr. Troester, the reporter has handed you

10   a series of documents.  And I'll represent to you

11   that they are examples of some pages of a Punch

12   Communication Log from the Hollywood Way store.  I'm

13   going to you ask a few questions about each page.

14            Defendants' Exhibit 10 bears the number,

15   Star Troester 000518; is that right?

16       A.   Oh, I'm looking in the wrong place.  Yes.

17       Q.   Do you see that near the top of the log,

18   there's an entry for you for October 7th?

19       A.   That's correct.

20       Q.   Is this your handwriting?

21       A.   Yes, it is.

22       Q.   And in the description, you see the column

23   entitled "Detailed Description"?

24       A.   Yes.

25       Q.   It states "coffee master class"?

89

1          A.    Yes.

2          Q.    What is your understanding of why you used

3    the Punch Communication Log on this date?

4          A.    This is an example of a training class at

5    another location where no district manager with

6    authority to -- to do automatic payments is there.

7          Q.    Further down the page, there's an entry on

8    October 11th for you.   Do you see that?

9          A.    Yes, I do.

10          Q.    Why did you use the Punch Communication

11    Log on that date?

12          A.    This would have been an example of when

13    they probably called me on my way into work and

14    asked me to swing by somewhere and pick up product

15    that was missing from the store.

16          Q.    So you used the log to make sure you got

17    paid for that time?

18          A.    Yes.

19          Q.    Because you were not on the clock at that

20    time?

21          A.    That's correct.

22          Q.    Okay.   Defendants' Exhibit 11 bears the

23    number, Star Troester 000525, correct?

24          A.    Yes.

25          Q.    Do you see the entry for November 2000 --

90

**KNOPP DECL EX A, PAGE 18**

1    I'm sorry, November 28, 2008?

2         A.   Yes, I do.

3         Q.   Is that your handwriting?

4         A.   Yes, it is.

5         Q.   Why did you use the Punch Communication

6    Log on this date?

7         A.   Same as the last one.

8         Q.   To ensure that you were paid for time

9    worked while not clocked in?

10        A.   While I was picking up product for the

11   store.

12        Q.   While you were not clocked in?

13        A.   Yes.

14        Q.   Defendants' Exhibit 12 bears the number,

15   Star Troester 000536; is that right?

16        A.   Yes, it does.

17        Q.   Do you see there's an entry for March 5th?

18        A.   Okay.   Yes, I do.

19        Q.   Is that your handwriting?

20        A.   Yes, it is.

21        Q.   Why did you use the Punch Communication

22   Log on that day?

23        A.   This one would be where I walk into the

24   store and instead of being able -- this would have

25   been during the middle of the day -- unable to go to

91

KNOPP DECL EX A, PAGE 19

1    the punch-in clock area, a guest in the lobby area

2    which was before the POS systems, knows me probably

3    and asked me for some assistance, for whatever

4    reason -- a conversation or a product, a purchase or

5    whatever.

6         Q.   So you had performed work before you

7    clocked in?

8         A.   Yes.

9         Q.   And you were using the Punch Communication

10   Log to make sure you got paid for that work?

11        A.   Yes.

12        Q.   And you were, in fact, paid for that work?

13        A.   Yes, I was.

14        Q.   Immediately below that, there's an entry

15   for March 7th.  Do you see that?

16        A.   Yes.

17        Q.   That's your handwriting?

18        A.   Yes, it is.

19        Q.   Why did you use the Punch Communication

20   Log on this date?

21        A.   This would probably be one where I forgot

22   to -- to clock out on my way out of store from a --

23   a separated duty that was not a normal duty.

24        Q.   So you were using the Punch Communication

25   Log to correct the time records?

92

KNOPP DECL EX A, PAGE 20

1      A.   Correct.

2      Q.   Defendants' Exhibit 13 bears the number,

3  Star Troester 000572, correct?

4      A.   Yes, it does.

5      Q.   There's an entry at the top of the page

6  for March 8th; is that right?

7      A.   Yes, it does.

8      Q.   Is that your handwriting?

9      A.   Yes, it is.

10      Q.   In the detailed description it states,

11  "Talking to MW"?

12      A.   Yes, it does.

13      Q.   What does that refer to?

14      A.   It would have been some conversation with

15  Michelle Westby.

16      Q.   A conversation that occurred off the

17  clock?

18      A.   I can't really answer that because I don't

19  know if my normal duty time would have been

20  considered on the clock.  But since it would have

21  been about official business, then I would have been

22  entitled to a payment.

23      Q.   So am I right that you're using the log to

24  ensure that you're paid for work that happened while

25  not clocked in?

93

KNOPP DECL EX A, PAGE 21

1          A.   That's correct.

2          Q.   And a little further down the page there's

3    an entry for March 14th.  Do you see that?

4          A.   Yes, I do.

5          Q.   Is that your handwriting?

6          A.   Yes, I -- yes, it is.

7          Q.   And it states "helping guests," right?

8          A.   Yes, it does.

9          Q.   Is this another exam of you using the log

10   to make sure you got paid for work performed in the

11   store while not clocked in?

12         A.   It is.

13         Q.   Okay.  And let's just make sure these are

14   identified.  Defendants' Exhibit 14 bears the

15   number, Star Troester 000573?

16         A.   Was that a question?

17         Q.   Yes.

18         A.   It does.

19         Q.   And Defendants' Exhibit 15 bears the

20   number, Star Troester 000593?

21         A.   It does.

22         Q.   On Defendants' Exhibit 14 -- actually, let

23   me refer you to 15 instead.

24              On Defendants' 15, there's an entry for

25   December 20th?

94

KNOPP DECL EX A, PAGE 22

1        A.    It's there, yes.

2        Q.    Is that your handwriting?

3        A.    It is.

4        Q.    And the description is "review."   Do you

5    have any understanding as to what that means?

6        A.    Not specifically, but that would have been

7    something to do with management.   I don't know what

8    the context of the review would have been.

9        Q.    Is this another example of you using the

10   log to make sure you're paid for work time that

11   occurred in the store while not clocked in?

12       A.    Yes, it is.

13       MR. KNOPP:   The videographer needs to change

14   the tape.   If you like, we can break for lunch now.

15   I'm -- I'm flexible.

16       MS. SCHWARTZKOPF:   It's fine with me either

17   way.

18       MR. KNOPP:   Why don't we do that.

19       MS. SCHWARTZKOPF:   Okay.

20       THE VIDEOGRAPHER:   This marks the end of

21   Videotape Number 1, Volume I, in the deposition of

22   Douglas Troester.   Going off the record.   The time

23   is 12:20 p.m.

24              (A break was taken)

25       THE VIDEOGRAPHER:   This marks the beginning of

95

KNOPP DECL EX A, PAGE 23

1       Q.    Discouraged from working overtime?

2       A.    Yes.

3       Q.    You familiar with the term "off-the-clock

4 work"?

5       A.    Yes, I am.

6       Q.    That's worked performed while you were not

7 clocked into the timekeeping system, right?

8       A.    Yes I'm aware of that.

9       Q.    And when you were employed by Starbucks in

10 California, did the company have a policy regarding

11 off-the-clock work?

12      A.    They do have a policy.

13      Q.    What is your understanding of the policy?

14      A.    As it says in the Partner Guide, there

15 should no be -- not be any off-the-clock work.

16      Q.    Are you familiar with the phrase "time

17 worked equals time paid"?

18      A.    Yes, that's also in the Partner Guide.

19      Q.    And you're familiar with that statement

20 when you worked for Starbucks in California?

21      A.    Yes, I'm aware of the statement.

22      Q.    What is your understanding of what that

23 means?

24      A.    The -- the statement basically says that

25 anything that you're doing for the company should be

100

**KNOPP DECL EX A, PAGE 24**

1    paid for.  And you need to follow the procedures and

2    routines to ensure that you're paid for that time.

3         Q.    You understood that the company's policy

4    was that partners should be paid for all the time

5    that they worked?

6         A.    To the point that the policy existed, but

7    there was conflicting policies.

8         Q.    Did you understand that Starbucks' policy

9    was that partners should be paid for all time

10   worked?

11        A.    I understood that, yes.

12        Q.    Did you also understand that the company

13   strictly prohibited off-the-clock work?

14        A.    No, I did not.

15        Q.    I'd like to refer you back to Defendants'

16   Exhibit 9, the Partner Guide, and Page 12 of it.

17        A.    (Witness complies.)  Okay, I'm there.

18        Q.    Do you see in the beginning of the page

19   there's a section entitled "recording time worked"?

20        A.    Yes, I do see that.

21        Q.    The second sentence states, "It is against

22   Starbucks' policy for any nonexempt partner work off

23   the clock or without having punched in or otherwise

24   recording the time as timed worked."

25              Did you understand that that was the

                                                      101

KNOPP DECL EX A, PAGE 25

1      A.    Nothing other than that, no.

2      Q.    How many times do you recall that

3   happening, when you were an employee of Starbucks in

4   California?

5      A.    I could say -- and I really couldn't give

6   a time, but I can remember one time happening where

7   I'm waiting almost a half an hour, but --

8      Q.    Can you recall any other times when you

9   had to wait for another employee --

10     A.    Not specifically.

11     Q.    You got to let me get the question out.

12     A.    I'm sorry.

13     Q.    Do you have any other recollection of any

14   other instances where you had to wait for another

15   employee to arrive before you could enter the store?

16     A.    Not that I can recall.

17     Q.    And am I correct that in this lawsuit

18   you're not asserting any claims regarding unpaid

19   time worked on non closing shifts?

20     A.    That is correct.

21     Q.    And besides what you just testified to, do

22   you claim that you worked any unpaid time on non

23   closing shifts?

24     A.    No.

25     Q.    Are you aware of any instances where other

106

KNOPP DECL EX A, PAGE 26

```
 1    was, leading to termination.  But when she left the

 2    company, I can't answer, due to privacy, whether it

 3    was her choice or not.

 4         Q.   When you say "due to privacy," talking

 5    about her privacy?

 6         A.   Her privacy.

 7         Q.   Do you know?

 8         A.   I can give my best guess.

 9         Q.   I don't want you to guess.  I just want to

10    know --

11         A.   Okay.  Then we'll just leave that as a no.

12         Q.   You need to let me get the full question

13    out.  I just want to know what you know.

14              Do you have any firsthand information

15    about the circumstances surrounding her separation

16    from Starbucks?

17         A.   No.

18         Q.   Do you know if these employees who

19    informed you that Ms. Aitken had asked them to work

20    off the clock, were compensated for that time by

21    Starbucks?

22         A.   To the best of my knowledge, no.

23         Q.   Do you know one way or the other?

24         A.   No.

25         Q.   The claims you assert in this lawsuit are
```

108

**KNOPP DECL EX A, PAGE 27**

1    based on alleged unpaid time worked exclusively on

2    closing shifts, correct?

3        A.    That's correct.

4        Q.    Am I right that the unpaid time you allege

5    on closing shifts occurred after the store was

6    closed to the public?

7        A.    Yes.

8        Q.    So the unpaid time you allege -- let me

9    back up.

10           So your claims are based exclusively on

11   alleged unpaid work performed after the store was

12   closed to customers, but before your work day was

13   over?

14       A.    I hate to make you do that, but let me

15   have you say it one more time so I make sure I don't

16   answer incorrectly.

17       MR. KNOPP:  Do you mind reading that back?

18           (The requested testimony was read back)

19       THE WITNESS:  Yes.

20   BY MR. KNOPP:

21       Q.    You -- you mentioned earlier that you

22   recall an occasion where you arrived for your

23   scheduled opening shift and you had to wait

24   approximately 30 minutes before you could enter the

25   store?

                                                    109

KNOPP DECL EX A, PAGE 28

1          Q.    Which partner was responsible for doing

2     that?

3          A.    That would be a supervisor or manager.

4          Q.    So on most closing shifts where you the

5     only -- you were the only supervisor or manager,

6     right?

7          A.    Most, yes.

8          Q.    And in that circumstance, you were

9     responsible for activating the alarm?

10         A.    Yes.

11         Q.    I believe you testified that there were

12    infrequent circumstances where there was a manager

13    or another shift supervisor present with you on a

14    closing shift?

15         A.    Yes.

16         Q.    On those -- on those situations, did

17    somebody else activate the alarm?

18         A.    It may have happened infrequently, but the

19    term "closing shift supervisor" was the -- the shift

20    supervisor in charge.

21              If a manager was there at the same time,

22    then their function as being a manager was not truly

23    a manager.  They were either just helping out being

24    a barista, but there was never really a closing

25    manager.

                                                      121

1    Q.   So even if there was a manager working

2    with you, typically you were still the person to

3    activate the alarm?

4    A.   Yes.

5    Q.   Did you have a -- how did you go about

6    activating the alarm?

7    A.   At the Hollywood Way store, the normal

8    function of that alarm at that location was you

9    would go to the back of the house and put in a

10   predefined code that was your code for the specific

11   shift supervisor that had already been programmed

12   and identified as you.

13          And you would go through the sequence of

14   ensuring that all the doors were locked first.   And

15   then you would get the green panel okay.   Then you

16   would enter the code.   You'd wait a few seconds.

17   Make sure that the code was activated and the

18   countdown timer started.   And then would you proceed

19   outside the store.

20   Q.   There was a countdown timer?

21   A.   Yes.

22   Q.   You had to get out -- you had to exit the

23   store before that timer elapsed?

24   A.   Yes.

25   Q.   Was it 45 seconds?

122

KNOPP DECL EX A, PAGE 30

```
 1          A.    To my knowledge, I believe it was one

 2    minute.

 3          Q.    Okay.   So from the time you set the alarm,

 4    you had one minute to exit the store?

 5          A.    Yes.

 6          Q.    What would happen if you didn't?

 7          A.    Then a signal would go to the alarm

 8    company and different form of beeping would happen.

 9    I guess would you call it a slight -- excuse me --

10    silent-alarm beeping.   And then we would have to

11    take time to correct that problem by shutting the

12    alarm off, contacting the alarm company and telling

13    them, "Oops, that's a mistake.   Here's my code.   I'm

14    such and such supervisor at location such and such.

15    And that was a false alarm."   And then basically

16    restart the whole sequence again.

17          Q.    Does that ever happen in your experience?

18          A.    Yes.

19          Q.    How many times?

20          A.    I really can't give a specific number, but

21    we could boil it down to, say, once a month.

22          Q.    Do you recall what your alarm code was?

23          A.    No, I do not.

24          Q.    Do you recall if you had a user number

25    that was different from your alarm code?
```

123

KNOPP DECL EX A, PAGE 31

1          A.   I think you're referring to pur --

2     potentially a employee ID number.

3          Q.   Do you recall being User Number 6?

4          A.   Oh, that would be, I believe, inside the

5     alarm panel.  The position that the manage assigned

6     to me.

7          Q.   Were you, in fact, User Number 6?

8          A.   To the best of my rec -- recollection,

9     yes.  I also recall that at some point that was

10    shifted around to -- it wasn't always I was six.  It

11    can could have been I was 4 or 5.

12               Probably had to do with like it was easier

13    to assign something new, like if we had to change

14    the staff --

15          THE REPORTER:  I'm sorry, if we had to change

16    the staff?

17          THE WITNESS:  If we had to change the

18    personal -- personnel that were on the alarm system,

19    then it maybe easier to go ahead and assign a new

20    number to you in a different slot, User Number X.

21    BY MR. KNOPP:

22          Q.   How long did it take you to activate the

23    alarm?

24          A.   The sequence to do the actual activation

25    would vary, because I do recall a time when the

124

KNOPP DECL EX A, PAGE 32

1    will process correctly.

2         Q.   When you were working for Starbucks in

3    California on a closing shift, one partner was

4    responsible for initiating a process whereby data in

5    the store's computers were sent to computers at the

6    company's headquarters, right?

7         A.   That's correct.

8         Q.   And that process involved running a

9    program on the manager workstation?

10        A.   That's correct.

11        Q.   And as shift supervisor, were you the

12   partner who was responsible for that task?

13        A.   The closing shift supervisor, yes.

14        Q.   And that process involved using the

15   computer's mouse?

16        A.   I can't recall.

17        Q.   Well, one way or another, it involved

18   selecting store close on the main menu of the

19   workstation, right?

20        A.   That's correct.

21        Q.   Either using its keyboard or the mouse?

22        A.   Yeah.   That -- to be fair, it's basically

23   the mouse.   And their system was totally messed up.

24   So likely I used the mouse, yes.

25        Q.   And then you would have to enter a

131

KNOPP DECL EX A, PAGE 33

1    password?

2         A.   I believe you entered the password to

3    identify yourself as the shift supervisor, then you

4    did the procedure.

5         Q.   And then the computer prompted you to ask

6    whether it should initiate the store-close process?

7         A.   Yeah.  There was two or three bulletpoints

8    that had basically said, "Do you want do this."  I

9    can't remember specifically what it said, but there

10   was two or three functions.  And I say "two or

11   three" because at one point there was three and then

12   they reduced it down to two.

13        Q.   And when prompted, you would type in the

14   letter Y?

15        A.   I think that's correct.

16        Q.   To indicate "yes"?

17        A.   Yes.

18        Q.   And from there, the computer would run

19   this process?

20        A.   Yes.

21        Q.   Was this the very last task you performed

22   before setting the alarm?

23        A.   Not always.

24        Q.   Were you given any instruction from

25   Starbucks as to whether initiating the store-close

                                                      132

KNOPP DECL EX A, PAGE 34

1    It's time to clock out now, so that I can go run the

2    reports on the Symphony at the manager's workstation

3    going to Seattle."

4         Q.    Okay.  So the partners remained on the

5    clock up until the point you were ready to initiate

6    this computer function?

7         A.    I will say very close to the point.

8         Q.    So am I right that you're not claiming any

9    unpaid work prior to the point where you are ready

10    to initiate this computer function?

11         A.    Yes, you're correct in saying that.

12         MS. SCHWARTZKOPF:  Can we take a break real

13    quick?

14         MR. KNOPP:  Sure.

15         THE VIDEOGRAPHER:  Going off the record.  Time

16    is 2:20 p.m.

17                   (A break was taken)

18         THE VIDEOGRAPHER:  Going on the record.  Time

19    is 2:33 p.m.

20    BY MR. KNOPP:

21         Q.    When you performed the task whereby you

22    initiated this computer process, how did you know

23    when your task was completed?

24         A.    As I mentioned before, there was a signal

25    on the computer that said that the transaction was

141

KNOPP DECL EX A, PAGE 35

1   the alarm system and then you have three

2   bulletpoints after that.

3           So to -- to go to answer that, you know,

4   this is -- the standard procedures during my

5   employment vary from what this document is -- is

6   saying.

7       Q.   What is the work you say you performed

8   after arming the alarm?

9       A.   Leaving the store with all partners.

10  Ensure that all doors are locked when leaving.  Walk

11  the partners to their vehicle.  And those are not

12  just within the standard.  That's a broad definition

13  of those.  To give you an example --

14      Q.   I want to know all of it.

15      A.   Okay.  To give you an example, walking in

16  the partners to their vehicle, that was a safety and

17  security issue.  That meant if somebody was waiting

18  for a ride from their parents, then you had to

19  actually wait with that second partner or usually a

20  third partner at that point, because it's not likely

21  that three partners would have to wait for their

22  parents or something.  Especially with me, I had my

23  own vehicle.

24          But that would have been an example that I

25  had several times where I actually had to wait with

148

KNOPP DECL EX A, PAGE 36

1    a partner while their parents would come pick them

2    up.

3        Q.   Besides everything you've testified to, do

4    you contend that you performed any other work for

5    which you should be paid after activating the alarm?

6        A.   The removing of patio furniture, if it

7    wasn't done before we actually activated the alarm.

8    It's like "Oh, we forgot this."  That was a frequent

9    thing that you would say, "Oh, we forgot to secure

10   this --

11       THE REPORTER:  I'm sorry, we forgot to?

12       THE WITNESS:  "We forgot to secure the patio

13   furniture, so let's do this quickly."

14   BY MR. KNOPP:

15       Q.   Besides everything you've testified to, do

16   you recall performing any other work for which you

17   believe you should be paid after activating the

18   alarm?

19       A.   Occasionally, the partner would say, "Oh,

20   I forgot a coat or jacket or personal piece of

21   property.  Can we go back inside and -- and retrieve

22   that, please?"

23       Q.   Anything else?

24       A.   In specific, no, but there may be other

25   circumstances that are of that type of nature.

149

**KNOPP DECL EX A, PAGE 37**

1      Q.   Okay.  I want to ask you questions about

2   everything you identified.  You said leaving the

3   store, you regard that as work for which you should

4   be paid?

5      A.   I regard that and Starbucks regards it, by

6   way of the definition in the document here.

7      Q.   Okay.  How long did it take you to leave

8   the store after arming the alarm?

9      A.   Would you like to clarify that some more?

10      Q.   How long did it take you to leave the

11   store after arming the alarm?

12      A.   If you're asking the question of where I

13   am -- basically left from Starbucks' premises.

14      Q.   How long did it take you to exit the store

15   after arming the alarm?

16      A.   Okay.  I believe you're asking that if --

17   if it was literally how long would it take to exit

18   after I got the code signal that the alarm is set?

19      Q.   Right.

20      A.   Probably 30 seconds to walk to the door.

21      Q.   And you claim you should be paid for that?

22      A.   Yes.  Again, as it's outlined in the

23   procedure manual.

24      Q.   Does this procedural manual say you should

25   be paid for walking to the door?

                                                      150

**KNOPP DECL EX A, PAGE 38**

```
 1          A.    Yes, because that has ensured all doors

 2    are locked and leave the store with the partners.

 3    So it covers both of those areas.

 4          Q.    Okay.  I'm going to get to that.  Right

 5    now --

 6          A.    Okay.

 7          Q.    -- I'm just asking about leaving to the

 8    store with all partners.

 9          A.    Okay.

10          Q.    And the other partners on the shift were

11    already waiting by the door, correct?

12          A.    Yes.

13          Q.    And usually it's just one other person,

14    right?

15          A.    Yes.

16          Q.    "Ensure that all doors are locked when

17    leaving."  You had to do that before the alarm was

18    activated, right?

19          A.    In addition to, yes.

20          Q.    Okay.  And then after the alarm was

21    activated, you had a minute to get out of the store,

22    right?

23          A.    At least.

24          Q.    And what would you do in terms of ensuring

25    that the doors are locked after the alarm is
```

                                                      151

KNOPP DECL EX A, PAGE 39

1    activated?

2         A.    From the point where the partner and I

3    were now standing outside the door, I would use the

4    key to secure the door, normal function.   Then I

5    would -- would rattle and shake the door a couple of

6    times just to make sure everything latched.

7         Q.    And how long did it take you to lock the

8    door and then rattle it?

9         A.    That could range from 15 minutes -- excuse

10   me -- 15 seconds, which would be, you know, no

11   problems, no concerns, I would say, to the point

12   where I mentioned before in the testimony, there was

13   a sticky door, that could be 30 seconds to couple

14   minutes.

15        Q.    A couple minutes to make sure that the

16   door was locked?

17        A.    Yes.   Because the door had some serious

18   problems until they actually got it fixed and -- I'm

19   done answering that question.

20        Q.    The other partner present with you was

21   free to leave at that point, right?

22        A.    Absolutely not.

23        Q.    The other partner present with you had to

24   stay until when?

25        A.    Until we were all walking out to the

152

KNOPP DECL EX A, PAGE 40

1   vehicles together or to whatever final destination

2   point, if they didn't have a vehicle, like their

3   parent's car or something of that nature.

4        Q.   The front door of your store opened to a

5   parking lot?

6        A.   Yes.

7        Q.   People who worked at Starbucks parked at

8   the parking lot?

9        A.   Yes.

10        Q.   And was it your practice to actually walk

11   partners to their vehicles?

12        A.   Absolutely.

13        Q.   How long did it take you to walk somebody

14   to their vehicle?

15        A.   The parking lot is a normal, large, busy

16   airport-style parking lot with -- well, roughly

17   seven or eight food service vendors in that area and

18   enough parking for everybody.  So it was a large

19   parking lot.

20             And we were required to park on the

21   outskirts and not have customer -- due to customer

22   convenience, not close to the store.  So it would be

23   about 35 to 45 seconds.

24        Q.   When you were not the closing shift

25   supervisor, did somebody walk you to your car?

153

KNOPP DECL EX A, PAGE 41

1          A.   I'll say no to that with the qualification

2     that if I was the one that was there, I was the

3     closing shift supervisor.   I can't recall a time

4     that --

5          Q.   If you worked a closing shift with the

6     store manager, did you walk the store manager to

7     their car?

8          A.   Yes.

9          Q.   When you were a barista in California

10     working a closing shift, did somebody walk you to

11     your car?

12          A.   I would say we walked together.   It's not

13     like somebody's duty is to walk a person to the car.

14     Now, there's just some natural things that I'm just

15     a large strong male and I have a young female,

16     that's the point of this whole procedure is to

17     protect that type of person.

18               But even still, I could be attacked too.

19     So it's a mutual walk together.   There's nobody

20     leading the pack, as it were.

21          Q.   The partners exit the store together?

22          A.   Yes.

23          Q.   That's for safety reasons?

24          A.   Yes.

25          Q.   You understood that Starbucks didn't want

154

KNOPP DECL EX A, PAGE 42

1    its employees to -- to keep opening the door to let

2    somebody leave?

3          A.    I'm not clear on your question there.

4          Q.    Starbucks didn't want the store employees

5    to open the door to let one partner leave, open the

6    door again to let somebody else leave.  That's a

7    security risk, right?

8          A.    Yeah.  Well, actually, that wouldn't be a

9    procedure at all.  It just would never happen,

10   according to closing procedures.

11         Q.    Because it's not safe?

12         A.    Exactly.  I would assume.

13         Q.    You mentioned that sometimes you waited

14   with a partner to get picked up?

15         A.    Uh-huh.

16         Q.    And you regard that as work for which you

17   should be paid?

18         A.    Yes.

19         Q.    Which is waiting outside the store?

20         A.    Yes.

21         Q.    Did anybody at Starbucks ever instruct you

22   to wait with an employee who was being picked up?

23         A.    I can't recall a specific time of that,

24   but it would be considered part of the safety and

25   security procedures.  It's -- it's part of the two

                                                        155

KNOPP DECL EX A, PAGE 43

1  things that would be in the original training.

2  Computer-based training, I recall seeing examples of

3  you know what could happen.

4       Q.   So you don't recall anybody telling you

5  verbally to wait with a partner who was being picked

6  up, correct?

7       A.   I'm going to say yes.  I recall a security

8  briefing with the loss prevention person going over

9  security, due to some attacks that happened to

10 Starbucks employees.  So I would say yes, that it

11 was talked about, "Make sure you stay together."

12      Q.   Did you work with any colleagues who

13 walked to work?

14      A.   The gentleman that I would wait for his

15 parents, I recall sometimes that if he found out Mom

16 wasn't coming, he would then start to walk home.

17      Q.   Did you walk him home?

18      A.   No, I did not.

19      Q.   So you would say "good-bye" at the door,

20 right?

21      A.   At the end of the parking lot.  Walk him

22 through the property that would be considered

23 Starbucks general business property area.  And it's

24 like, you know, I would feel bad.  You know, "I hope

25 you get home safe, Ivan," but.

156

1        Q.    Did you work with any colleagues who rode

2    their bikes to work?

3        A.    Yes.

4        Q.    Where would you part ways with them?

5        A.    I can't recall a closing person ever

6    riding their bike, but there was definitely some mid

7    shift people that did.

8        Q.    You mentioned that sometimes after setting

9    the alarm and locking the door, you discovered that

10   the patio furniture was still outside?

11       A.    That's correct.

12       Q.    How frequent did that happen?

13       A.    If I had to quantify, maybe once every

14   couple of months for that specific one.

15       Q.    In that circumstance, would you unlock the

16   door, right?

17       A.    That's correct.

18       Q.    Then would you deactivate the alarm,

19   correct?

20       A.    That is correct.

21       Q.    Then you'd bring the patio furniture

22   inside, right?

23       A.    Yes.

24       Q.    Did you record the time it took you to do

25   that on the Punch Communication Log?

                                                    157

**KNOPP DECL EX A, PAGE 45**

1          A.    No.

2          Q.    Why not?

3          A.    Because basically a function of that we

4    did not miss the punch already, we're just doing the

5    final let's-go-home procedures.

6          Q.    Is that any different in your mind than

7    the occasions when you arrived at the store and

8    helped a customer before clocking in?

9          A.    Yes, it is.

10         Q.    How so?

11         A.    Because the situation with the customers

12   would be -- say I was supposed to report at 11:00.

13   While I would walk into the store approximately

14   1:00, I was known for not being late.  Always on

15   time.  And then at some point, the conversation

16   would take me past the point where I would

17   conveniently go and punch in.

18          So say I was talking to somebody about

19   buying some coffee for 15 minutes, well, I've missed

20   my chance to do a punch, so since I missed a punch,

21   then I would use the missed-punch log to take care

22   of that.

23          Whereas, the difference is -- the other

24   way is, you know, the punch is already recorded in

25   the computer, so I didn't have a missed punch.

                                                      158

KNOPP DECL EX A, PAGE 46

1       Q.    You mentioned that sometimes you had to

2   re-enter the store because somebody forgot -- left a

3   coat inside?

4       A.    Yes.

5       Q.    How many times did that happen?

6       A.    Again, it was infrequent.  I'll give it

7   the same, once every couple of months.

8       Q.    When it did occur, how long did it take

9   for somebody to re-enter the store and get their

10  coat and then exit?

11      A.    Probably very similar to the case of the

12  tables.  Depending on where their coat was or piece

13  of property or whatever they were trying to achieve.

14  But maybe just a little bit less because, you know,

15  you're not going back and forth with four or five

16  table.

17      Q.    Can you estimate how long it took?

18      A.    It would probably be five minutes.

19      Q.    And how many times did you have to -- or

20  how many times did you, in fact, wait for a partner

21  outside the store to be picked up by somebody else?

22      A.    That was a little bit more frequent in my

23  case, because Ivan didn't have a vehicle.  And he

24  was one of my regular closers.  So I would say that

25  would maybe approach two, three times a month.

159

KNOPP DECL EX A, PAGE 47

1          A.    Yes.

2          Q.    And that took 30 to 45 seconds?

3          A.    That's agreeable.

4          Q.    Do you contend that you should be paid for

5     the time spent walking to your own car by yourself?

6          A.    I can't recall a time that would have ever

7     happened.

8          Q.    After Ivan gets in his car, what do you do

9     next?

10         A.    Then we're both getting into the car at

11    the same time, in the same area and then leaving.

12         Q.    You're getting -- your own car is parked

13    nearby?

14         A.    Yes.

15         Q.    Okay.   Did you ever make any effort to get

16    paid for any of the work you performed after

17    activating the alarm?

18         A.    Yes.

19         Q.    Please explain.

20         A.    This lawsuit.

21         Q.    Before now?

22         A.    No.

23         Q.    I -- I believe you testified that your

24    practice was to clock out before initiating the

25    computer function you testified about?

                                                           167

**KNOPP DECL EX A, PAGE 48**

1          A.    That's correct.

2          Q.    I'd like to refer you back to Defendants'

3    Exhibit 17.

4          A.    Okay.  You're holding 16.

5          Q.    I know.

6          A.    Okay.

7          Q.    And Page 4.34.

8          A.    Okay.

9          Q.    Do you see .7?

10         A.    Yes.

11         Q.    It states in part, "Partners can punch out

12   using the POS registers, but the MWS cannot be

13   used."

14              Did you understand that even after the

15   computer process was initiated, partners could still

16   punch out using the POS registers?

17         A.    No, I did not understand that.

18         Q.    Did anybody ever tell you that that was

19   not the case?

20         A.    Yes.

21         Q.    Who told you that?

22         A.    It would more than likely be originally in

23   the training, Marianna Vitali and then the store

24   managers also would go over that again, after the

25   training --

168

KNOPP DECL EX A, PAGE 49

1      Q.    Okay.

2      A.    -- on-the-job coaching.

3      Q.    It's your testimony that you talked to

4   Ms. Vitali about when to clock out in relation to

5   initiating the computer function?

6      A.    No, I did not talk to her.  It was trained

7   that this is how the new computer works.

8      Q.    The new computer system?

9      A.    Yes.

10     Q.    Okay.  Was there an old computer system

11  where you could clock out after initiating the

12  computer function?

13     A.    I don't remember the exact sequence of the

14  old computer system.

15     Q.    So it's possible under the old computer

16  system that you could clock out after initiating the

17  computer function?

18     A.    It's possible.

19     Q.    And when was that old system replaced?

20     A.    It was -- as I said, I -- I -- pretty sure

21  was earlier than November of 2010.

22     Q.    Well, what's your best recollection?

23     A.    Early summer.

24     Q.    Of 2010?

25     A.    Yes.

169

KNOPP DECL EX A, PAGE 50

```
 1    was a much longer period that we had to clock out

 2    first and then do the action on the terminal.

 3    BY MR. KNOPP:

 4         Q.   Okay.  Let me -- let me clarify now.  So

 5    prior to summer of 2009, the computer system was

 6    somehow different?

 7         A.   There was constantly updates throughout

 8    the time frame of my employment at Starbucks.

 9         Q.   Okay.  Prior to the summer of 2009 as far

10    as you remember, you could clock out after

11    initiating the computer function?

12         A.   And again, I'm vague on what the procedure

13    was before that.

14         Q.   Okay.

15         A.   I just remember a change around 2009 --

16    summer of 2009 and -- in the way we handled the

17    computer system.

18         Q.   So your testimony is that starting around

19    the summer of 2009, you began clocking out before

20    initiating the store-close computer process?

21         A.   At the manager's workstation, that's

22    correct.

23         Q.   Now, do you have any understanding as to

24    whether the system required that you clock out

25    first?
```

172

**KNOPP DECL EX A, PAGE 51**

```
 1          Q.    Yeah.

 2          A.    Yes.

 3          Q.    Did you ever make any efforts to get paid

 4    for time spent initiating the computer program?

 5          MS. SCHWARTZKOPF:   Objection.   Asked and

 6    answered.

 7                But you can answer again.

 8          THE WITNESS:   No.

 9    BY MR. KNOPP:

10          Q.    Besides Ms. Vitali -- am I saying that

11    right?

12          A.    As best as I know, yes.

13          Q.    Okay.   Besides Ms. Vitali, do you recall

14    speaking with any other specific individuals about

15    when to clock out in relation to initiating the

16    computer program?

17          A.    I'm sure the conversation happened with

18    Michelle Westby as well, but --

19          THE REPORTER:   Michelle -- I'm sorry?

20          THE WITNESS:   Michelle Westby.

21    BY MR. KNOPP:

22          Q.    I'm asking what you remember.

23          A.    I don't remember a specific conversation,

24    no.

25          Q.    Do you remember a specific conversation
```

                                                         175

KNOPP DECL EX A, PAGE 52

```
 1      They had the diligence to go ahead and do something

 2      there.  That's why we would step out and say, "Are

 3      you ready for the alarm system?"

 4          Q.  I want to make sure today's record is

 5      complete.  So besides everything you've testified to

 6      already, do you claim that you performed any other

 7      work for which Starbucks didn't pay you on closing

 8      shifts?

 9          A.  No.

10          Q.  Do you have any records or documents that

11      show the amount of time you say for which you should

12      be paid?

13          A.  No.

14      MR. KNOPP:  20, 21.

15      (Whereupon Exhibits 20 and 21 were marked for

16                    identification)

17      BY MR. KNOPP:

18          Q.  Mr. Troester, the reporter has given you a

19      couple documents marked as Defendants' Exhibit 20

20      and 21.

21              The -- the document marked as Defendants'

22      as Exhibit 20 is a report of the alarm records from

23      the Hollywood Way store.  And the document that's

24      been marked as Defendants' Exhibit 21 is a report of

25      the time punches during your employment with
```

177

**KNOPP DECL EX A, PAGE 53**

1    Starbucks.

2              I don't imagine you've seen either of

3    these documents before, have you?

4         A.   Absolutely not.

5         Q.   All right.   I'm going to you ask a few

6    questions about what they show.   And I understand

7    you haven't seen them before, so I'll try to walk

8    you through it slowly.

9              If you flip to the very back of

10   Defendants' Exhibit 21, the time records, I'd like

11   you to look at Page Star Troester 000168.

12        A.   (Witness complies.)   I'm on that page.

13        Q.   And let's start at the entries for

14   October 20th, 2010.   Do you see that?

15        A.   Yes, I do.

16        Q.   And I'll explain what I think this shows.

17   And -- and you can tell me if you -- if you

18   understand.

19              This appears to show that on October 20th,

20   2010 you clocked in for the first time at 2:15 p.m.

21   Do you see that?

22        A.   Yes.

23        Q.   And then you clocked out for a meal break

24   at 5:52 p.m.   Do you see that?

25        A.   Yes.

178

KNOPP DECL EX A, PAGE 54

1          Q.    And then you clocked back in at 6:26 p.m.?

2          A.    Yes.

3          Q.    And then you clocked out for the day at

4     10:48 p.m.  You see that?

5          A.    Yes.

6          Q.    Do you understand what this document shows

7     the same way I do?

8          A.    Certainly.

9          Q.    Okay.  I'd like you to keep it open to

10    that page.  And now turn to Defendants' Exhibit 20.

11    Near the very back, there's a page Star Troester

12    001033.  I'd like you to find that page.

13         A.    (Witness complies.)  I'm there.

14         Q.    Do you see there a number of entries for

15    October 20th, 2010?

16         A.    Yes, I do.

17         Q.    One of them is at 10:49 p.m.  Do you see

18    that?

19         A.    Yes, I do.

20         Q.    And it states, "log pass card closed."  Do

21    you see that?

22         A.    Yes.

23         Q.    And it indicates that User 6 was involved?

24         A.    Yes.

25         Q.    We think that was you, correct?

179

1          A.    It's -- yes, probably.

2          Q.    Okay.  So for October 20th, 2010, the time

3    records indicate that you -- you clocked out at

4    10:48 p.m., right?

5          A.    Yes.

6          Q.    Do you have any reason to believe that's

7    not accurate?

8          A.    No.

9          Q.    And the alarm records indicate that you

10   activated the alarm at 10:49 p.m.  Do you see that?

11         A.    Yes.

12         Q.    Do you have any reason to believe that's

13   not accurate?

14         A.    No.

15         Q.    Okay.  Looking back at the time records on

16   October 21st, 2010, you did not work a closing

17   shift, correct?

18         A.    Correct.

19         Q.    And your next shift was October 23rd,

20   2010?

21         A.    That's correct.

22         Q.    And the time records show you clocked out

23   at 10:44 p.m.?

24         A.    That's correct.

25         Q.    Do you have any reason to believe that's

180

KNOPP DECL EX A, PAGE 56

1    not accurate?

2           A.   No, I don't.

3           Q.   If you look back at the alarm records and

4    you scroll down to October 23rd, you'll see there's

5    an entry for "close" at 10:45 p.m.  Do you see that?

6           A.   Yes.

7           Q.   The alarm records indicate that you

8    activated the alarm at 10:45 p.m., right?

9           A.   And 42 seconds.

10          Q.   Correct.  Do you have any reason to

11   believe that's not accurate?

12          A.   No.

13          Q.   Looking back at the time records, you see

14   the entries for the shift on October 24th, 2010?

15          A.   Yes, I do.

16          Q.   And these records show that you clocked

17   out at the end of the day at 10:42 p.m., correct?

18          A.   Correct.

19          Q.   Do you have any reason to believe that's

20   not accurate?

21          A.   No, I don't.

22          Q.   The alarm records show an entry by User 6

23   at 10:43 p.m.

24               Do you see that?

25          A.   Yes, I do.

181

KNOPP DECL EX A, PAGE 57

1          Q.    And they indicate that you activated the

2     alarm to close the store at 10:43 p.m., correct?

3          A.    Correct.

4          Q.    Do you have any reason to believe that's

5     not accurate?

6          A.    No, I don't.

7          Q.    The next shift you worked was

8     October 26th, 2010?

9          A.    Yes.

10         Q.    And you clocked out that day at

11    0:51 p.m.?

12         A.    Yes.

13         Q.    You have any reason to believe that's not

14    accurate?

15         A.    No.

16         Q.    The -- the alarm records show that you

17    activated the alarm at 10:52 p.m.; is that right?

18         A.    I haven't found that one yet.  Yes, that

19    is correct.

20         Q.    Do you have any reason to believe that's

21    not accurate?

22         A.    No, I don't.

23         Q.    Now, I -- I have no interest in doing this

24    for every day that --

25         A.    Absolutely.

                                                        182

KNOPP DECL EX A, PAGE 58

```
 1         Q.   -- that you worked for Starbucks, but

 2    these handful of days -- which I picked more or less

 3    randomly, but you don't have to take my word for it,

 4    these handful of days seem to show that the alarm is

 5    being activated one minute after you're clocking

 6    out?

 7         A.   And that's what I've testified to, one

 8    minute to two minutes.

 9         Q.   So your testimony is that you activated

10    the alarm one to two minutes after you clocked out?

11         A.   The majority of the time, yes.

12         Q.   Okay.  I didn't understand that to be your

13    testimony.  So I want to make it very, very clear.

14         A.   Yeah, if I didn't and I made it confusing,

15    no, that's my intent was.

16         Q.   Okay.  So --

17         A.   Just what the qualifications that there

18    may be circumstances like I said where I stuck my

19    head out, "Are you done and ready to go?  No."

20              We could probably find one or two of those

21    throughout the many years.

22         Q.   Okay.  So I just want to make it clear.

23    It's your testimony that on the majority of the

24    closing shifts you worked, you activated the alarm

25    one to two minutes after you clocked out?
```

                                                        183

**KNOPP DECL EX A, PAGE 59**

```
 1    discussing it with her.

 2    BY MR. KNOPP:

 3         Q.   So you never complained to partner

 4    resources that you should be paid for additional

 5    time worked on closing shifts, correct?

 6         A.   That's correct.

 7         Q.   You never used the -- the help line to

 8    make a complaint of that nature, correct?

 9         A.   That's correct.

10         Q.   Did you ever discuss this issue with your

11    district manager?

12         A.   Not that I recall.  It may have came up in

13    the training with the other shift supervisors and

14    managers there that, "Well, what are you really

15    asking us to do."

16         Q.   I'm just asking about what you recall.

17         A.   Okay.  I don't recall it.

18         Q.   But do you recall talking to a store

19    manager about this issue?

20         A.   Which issue?

21         Q.   The issue of whether you should be paid

22    for additional time worked on closing shifts?

23         A.   If you're asking did I talk to my store

24    manager, Michelle Westby?

25         Q.   Yes.
```

187

```
 1    and not based on our conversations.

 2         THE WITNESS:  If you take the entirety of the

 3    testimony I made today, that would be my beliefs and

 4    understanding.

 5    BY MR. KNOPP:

 6         Q.   My understanding of your claim is that the

 7    pay statements are inaccurate because they didn't

 8    reflect the pay you earned, but never received?

 9         A.   I think that's a fair statement.

10         Q.   I got it right?

11         A.   Yes.

12         Q.   Okay.  Do you contend that you've been

13    injured in any way as a result of inaccuracies in

14    the pay statements?

15         MS. SCHWARTZKOPF:  Same objections.  It calls

16    for a legal conclusion.  He's not an attorney and

17    he's not required to know the law.

18              But can you answer.

19    BY MR. KNOPP:

20         Q.   You can answer.

21         A.   I don't have some pay that I was entitled

22    to so, yes.

23         Q.   You feel like you've been harmed in any

24    other way, besides what you just described?

25         MS. SCHWARTZKOPF:  Same objections.
```

193

**KNOPP DECL EX A, PAGE 61**

1              PENALTY OF PERJURY CERTIFICATE

2

3        I hereby declare I am the witness in the within

4     matter, that I have read the foregoing transcript and

5     know the contents thereof; that I declare that the same

6     is true to my knowledge, except as to the matters which

7     are therein stated upon my information or belief, and as

8     to those matters, I believe them to be true.

9        I declare being aware of the penalties of perjury,

10    that the foregoing answers are true and correct.

11

12

13

14

15        Executed on the _____ day of _____, _____,

16    at _____, _____.

17              (CITY)                    (STATE)

18

19

20

21        _____

22              DOUGLAS R. TROESTER

23

24

25

                                                      195

KNOPP DECL EX A, PAGE 62

```
 1   STATE OF CALIFORNIA      )
                              ) ss:
 2   COUNTY OF ORANGE         )

 3

 4        I, LINDA D. WHITE, do hereby certify:

 5        That I am a duly qualified Certified Shorthand

 6   Reporter, in and for the State of California, holder of

 7   certificate number 12009, which is in full force and

 8   effect and that I am authorized to administer oaths and

 9   affirmations;

10        That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13        That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17        That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21        That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24        That prior to the completion of the foregoing

25   deposition, review of the transcript was not requested.
```

196

KNOPP DECL EX A, PAGE 63

```
1              I further certify that I am not a relative or

2      employee or attorney or counsel of any of the parties,

3      nor am I a relative or employee of such attorney or

4      counsel, nor am I financially interested in the outcome

5      of this action.

6

7              IN WITNESS WHEREOF, I have subscribed my name

8      this  14th  day of  March          ,  2013 .

9

10

11     _____

12             LINDA D. WHITE, CSR No. 12009

13

14

15

16

17

18

19

20

21

22

23

24

25                                                          197
```

KNOPP DECL EX A, PAGE 64