# EXHIBIT A

1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4

5   DOUGLAS TROESTER, on behalf  )
    of himself, and all other    )
6   similarly situated,          )
                                 )
7                  Plaintiff,    )
                                 )
8       vs.                      ) Case No.
                                 ) 2:12-cv-07677-GAF-PJW
9                                )
    STARBUCKS CORPORATION, a     ) Volume I
10  Washington corporation, and  )
    DOES 1-50, Inclusive,        )
11                               )
                   Defendants.   )
12  _____)

13

14

15            DEPOSITION OF DOUGLAS R. TROESTER

16                 Los Angeles, California

17               Wednesday, March 6, 2013

18

19

20

21

22

23

24  Reported by:  Linda D. White
                  CSR No. 12009
25  NDS Job No.:  153830

                                                          1

```
 1                  UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   DOUGLAS TROESTER, on behalf  )
     of himself, and all other    )
 6   similarly situated,          )
                                  )
 7                   Plaintiff,   )
                                  )
 8      vs.                       ) Case No.
                                  ) 2:12-cv-07677-GAF-PJW
 9                                )
     STARBUCKS CORPORATION, a     ) Volume I
10   Washington corporation, and  )
     DOES 1-50, Inclusive,        )
11                                )
                     Defendants.  )
12   _____ )

13

14

15            DEPOSITION OF DOUGLAS R. TROESTER,

16      taken on behalf of the Defendants, at 2029 Century

17      Park East, Suite 2400, Los Angeles, California,

18      beginning at 10:03 a.m., on Wednesday, March 6,

19      2013, before Linda D. White, Certified Shorthand

20      Reporter Number 12009 for the State of California,

21      pursuant to Notice.

22

23

24

25
```

2

1    APPEARANCES:

2

3    For the Plaintiff:

4         SETAREH LAW GROUP, P.C.
          BY:  HAYLEY SCHWARTZKOPF, ESQ.
5         9454 Wilshire Boulevard
          Penthouse Suite
6         Beverly Hills, California  90212
          (310) 888-7771

7

8    For the Defendants:

9         AKIN GUMP STRAUSS HAUER & FELD, LLP
          BY:  GREGORY W. KNOPP, ESQ.
10        2029 Century Park East
          Suite 2400
11        Los Angeles, California  90067
          (310) 229-1000

12

13

14   Also Present:

15        PETER KALISCH, The Videographer

16

17

18

19

20

21

22

23

24

25

3

```
 1                        INDEX

 2

 3    WITNESS

 4    DOUGLAS R. TROESTER

 5    EXAMINATION                                    PAGE

 6     BY MR. KNOPP                                     7

 7

 8

 9                       EXHIBITS

10    MARKED              DESCRIPTION               PAGE

11    Exhibit 1    Application for Employment         21
                   dated 28 April 2005
12
      Exhibit 2    Resume                             21
13
      Exhibit 3    Memo from Michelle Westby dated    62
14                 11/2/2010

15    Exhibit 4    Memo from Michelle Westby dated    64
                   January 6, 2011
16
      Exhibit 5    Memo from Sandy Bowles             68
17
      Exhibit 6    Memo from Andrew Trotter dated     68
18                 12/28/10

19    Exhibit 7    Appeals Request dated January      70
                   30, 2012
20
      Exhibit 8    Signature Page dated 2-5-08        78
21
      Exhibit 9    Partner Guide                      85
22
      Exhibit 10   Punch Communication Logs           89
23
      Exhibit 11   Punch Communication Logs           89
24
      Exhibit 12   Punch Communication Logs           89
25
```

4

EXHIBITS (Continued)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Punch Communication Logs | 89 |
| Exhibit 14 | Punch Communication Logs | 89 |
| Exhibit 15 | Punch Communication Logs | 89 |
| Exhibit 16 | Opening and Closing Responsibilities | 114 |
| Exhibit 17 | Partner Cash Handling | 128 |
| Exhibit 18 | Complaint | 142 |
| Exhibit 19 | Store Security Systems | 146 |
| Exhibit 20 | Activity Report dated 2/5/2008 to 1/6/2011 | 177 |
| Exhibit 21 | Partner Time Punch Report for Douglas Troester | 177 |
| Exhibit 22 | Synopsis of Discrimination at Starbucks | 188 |

QUESTIONS WITNESS

INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

(None)

5

1    that.

2         Q.   Defendants' Exhibit 2, your resume,

3    describes your employment experience prior to July

4    of 1997; is that right?

5         A.   That is correct.

6         Q.   When you worked for any of these companies

7    listed on the second page of Defendants' Exhibit 2,

8    did you ever form the belief that they had failed to

9    pay you for time worked?

10        A.   Actually these were all management level,

11   controlling positions, so they were all salary, so

12   no.

13        Q.   You -- you can put that document aside.

14   Thank you.

15             Why are you suing Starbucks?

16        A.   I was not paid for some time that was

17   doing -- performing described functions from the

18   training and assignments of any barista or shift

19   supervisor in the closing duties of the day.

20        Q.   Are you suing Starbucks for any other

21   reason?

22        A.   No.

23   MS. SCHWARTZKOPF:  I'm going to interpose a

24   late objection to the extent it calls for a legal

25   conclusion.

                                                      33

1        Q.    In what job position?

2        A.    A barista.

3        Q.    Did you accept that offer?

4        A.    Yes, I did.

5        Q.    So when you returned to Starbucks in

6    February 2008, you started working as a barista?

7        A.    That's correct.

8        Q.    In which store?

9        A.    I was slated for the Hollywood Way store,

10   but it was probably a month, maybe a

11   month-and-a-half to be opened.  So they started some

12   retraining with the rest of the crew that was going

13   to move over, in the Enterprise Landing one.

14       Q.    So you started in the Enterprise Landing

15   store?

16       A.    Yes.

17       Q.    For about a month or a month-and-a-half?

18       A.    Yes.

19       Q.    And then you moved to the Hollywood Way

20   store?

21       A.    Yes.

22       Q.    And was the Hollywood Way store your

23   assigned store for the duration of your employment?

24       A.    Yes.

25       Q.    At some in time, you were promoted to

52

1    shift supervisor?

2         A.   Yes.

3         Q.   Was that in June of 2008?

4         A.   Yes.

5         Q.   And you remained a shift supervisor

6    throughout the re -- remainder of your employment?

7         A.   Yes.

8         Q.   Did you ever seek a promotion above the

9    shift supervisor position?

10        A.   Yes.

11        Q.   What did you do to -- in an effort to get

12   promoted?

13        A.   I con -- contacted the store manager

14   first.  And then she referred me to two sources.

15   One was a hiring fair for managers and then the

16   district manager that was in charge at that time.

17        Q.   Who was the district manager?

18        A.   Christian.  I can't recall his last name.

19        Q.   Did you ever formally apply for a

20   management position?

21        A.   Yes, I did.

22        Q.   In what year?

23        A.   It would have been 2009.

24        Q.   And what became of your application?

25        A.   Christian went through the process of

                                                        53

1    the one that you showed me.  I think there was some

2    documents signing -- turning over keys possibly.

3    You know, just routine.

4         Q.   Did she give you a paycheck?

5         A.   Yes, she did.

6         Q.   Did the check include the wages you had

7    earned up until that day?

8         A.   In -- other than what I'm disputing is

9    missing, yes.

10        Q.   Okay.  And this meeting occurred on

11   January 6th?

12        A.   Yes.

13        Q.   Did you work a shift that day?

14        A.   Scheduled, but no.

15        Q.   You came to work -- you were on the

16   schedule to work that day?

17        A.   Yes.

18        Q.   And was Ms. Westby there when you arrived?

19        A.   Yes.

20        Q.   And you had the meeting at that point?

21        A.   Yes.

22        Q.   You can -- you can put these documents

23   aside, please.  Thank you.

24        A.   (Witness complies.)

25        Q.   You mentioned that when you first returned

                                                            72

1    to Starbucks in 2008, you started working in a store

2    other than the Hollywood Way store?

3         A.    Yes.

4         Q.    I'm sorry, how did you describe that

5    store?

6         A.    I think it's called Enterprise Landing.

7    To help, it's a large shopping center just less than

8    a mile away on the I-5 -- off the I-5.

9         Q.    Do you recall -- and you were a barista at

10   the time, right?

11        A.    Yes.

12        Q.    Do you recall working any closing shifts

13   at that store?

14        A.    Yes, I do.

15        Q.    Besides the Hollywood Way store and the

16   Enterprise store, did you work in any other

17   California stores?

18        A.    Yes, many and varied.

19        Q.    Many different ones?

20        A.    Yes.

21        Q.    Are they all within a geographic area that

22   can you describe?

23        A.    At the time the district boundaries for

24   Starbucks shift.  But usually it was within a

25   district because there is basically a program for

73

1     good-quality supervisors to go from store to store

2     to fill in when somebody needed a day off and

3     schedules didn't match.

4         Q.   How frequently did you work in a store

5     other than your home store?

6         A.   A minimum of once a month.  Probably a

7     couple three times a month.

8         Q.   Were there some stores besides your home

9     store that you more regularly worked in than others?

10        A.   I would say yes.  To give a good example,

11    Lankershim and -- and Magnolia.  And also the other

12    store Michelle Westby came from.  I can't remember

13    the name of that store, but it's often the record

14    I'm sure.

15             And -- but yeah, it was definitely stores

16    that were within about a 10 to 20 -- well, I would

17    say 10-mile radius of Hollywood Way.

18        Q.   In the Hollywood Way store, where did the

19    employees enter and exit?

20        A.   It was a strip mall.  So you would enter

21    in the front doors off the parking lot.

22        Q.   Were those the only doors to the store?

23        A.   No, it was not.

24        Q.   Was there a back door?

25        A.   There was.

74

1      the Partner Guide?

2           A.   No.

3           Q.   Did you un -- understand it?

4           A.   Yes, I did.

5           Q.   As shift supervisor, were you responsible

6      for knowing the company's policies?

7           A.   That was a duty and responsibility.

8           Q.   And the Partner Guide included policies

9      regarding pay for time worked, correct?

10          A.   As I recall, it briefly discussed payment

11     and.

12          Q.   Did you ever go through a training program

13     for shift supervisors?

14          A.   Absolutely.

15          Q.   At what point in time did that occur?

16          A.   Once you're promoted, you're officially on

17     about a 90-day training schedule as a shift

18     supervisor.  So I did that originally in Las Vegas

19     for my promotion to when I also got the promotion in

20     California.

21          Q.   So you went through the program twice?

22          A.   Yes.

23          Q.   What do you recall about the training

24     program?

25          A.   The training programs are basically

81

1      methods to describe each position.   What's expected,

2      very much like the Partner Guide, but specific job

3      duties versus general duties and -- and policy

4      regulations.

5           Q.    So the training program included your

6      review of written materials?

7           A.    Yes.

8           Q.    And was there any classroom instruction?

9           A.    I wouldn't call it classroom but it would

10     be computer-based training with a -- a training

11     coach, which was usually somebody at a higher level.

12     But occasionally if it was a simple thing, it would

13     be a -- a experienced shift supervisor that would

14     also help you through the training.

15          Q.    You were given some hard copy, written

16     materials as well?

17          A.    Yes.

18          Q.    You were asked to review them?

19          A.    Yes, I was.

20          Q.    And you did, in fact, do that?

21          A.    I did.

22          Q.    And those materials described various

23     company policies?

24          A.    Yes, they did.

25          Q.    And also the duties of the shift

82

1    supervisor?

2         A.    Yes, they did.

3         Q.    You were expected to understand those

4    materials?

5         A.    Absolutely.

6         Q.    And to implement their teachings in

7    performing your job?

8         A.    Yes.

9         Q.    When you were employed by Starbucks in

10   California, were you aware of the avenues you could

11   use to make complaints about things that happened in

12   the workplace?

13        A.    I was aware of Starbucks' methods of

14   handling those procedures.

15        Q.    Okay.  Yeah, that -- that's what I meant.

16        A.    Okay.

17        Q.    You were aware that you could make a

18   complaint about something hap -- happening in the

19   workplace to your store manager, for example?

20        A.    Yes.

21        Q.    And to a district manager?

22        A.    Yes.

23        Q.    Are you familiar with partner resources?

24        A.    Yes, I am.

25        Q.    What is partner resources?

                                                           83

1          And I'd like to direct your attention to

2     Page 12 of the document.  If you could just take a

3     minute to read that to yourself, I would appreciate

4     that.

5          A.   (Witness complies.)

6          Q.   Have you had a chance to review Page 12 of

7     the Partner Guide?

8          A.   Yes, I have.

9          Q.   Now, when you were employed by Starbucks,

10    you were responsible for recording all of your hours

11    worked, correct?

12         A.   That is correct.

13         Q.   And how did you do that?

14         A.   The POS system housed the software to take

15    care of punch-ins and punch-outs.

16         Q.   Did you understand that you were required

17    for recording your hours worked so that you could

18    paid for your time?

19         A.   Yes.

20         Q.   And did you always record your hours

21    worked accurately?

22         A.   To the best of ability.

23         Q.   And were you paid for all the time that

24    you recorded in the POS system?

25         A.   Could you clarify that question, please?

86

1     Q.   Yes.  Were you, in fact, paid for the time

2   you recorded?

3     A.   For the things that went through the POS

4   system, yes.

5     Q.   And as a Starbucks employee, you were also

6   responsible for reviewing your paycheck to ensure

7   that you were being paid the time you worked,

8   correct?

9     A.   That's correct.

10    Q.   Was it your practice to do so?

11    A.   Infrequently, yes.

12    Q.   Are you familiar with something called the

13   Punch Communication Log?

14    A.   Yes.

15    Q.   What is your understanding what that

16   document is?

17    A.   The -- the document was something in a

18   book that gave about three or four lines, that

19   allowed for any employee during a given day that

20   might have missed a punch-in or a punch-out to

21   physically write it in.

22    Q.   So the Punch Communication Log was

23   available to the employees if an error was made in

24   punching in or punching out, correct?

25    A.   That's correct.

87

1        Q.    And it was also available to the employees

2    if for whatever reason they worked time while not

3    clocked in, correct?

4        MS. SCHWARTZKOPF:   Objection.   Lack of

5    foundation.

6            You can answer.

7        THE WITNESS:   The punch log was there, but it

8    was definitely known in the culture to only be for

9    missed punches on the terminal.   The other time the

10   punch log would be used is if you would got to like

11   a training event and you couldn't punch in in your

12   home store.

13           Then they -- the corporation would handle

14   it one or two ways.   They would either say, "Go back

15   and put it in the punch log," or case like -- if

16   it's Marianna Vitali, she had the authority to

17   just -- everybody that went to the training, she

18   would take care of it at her DM level.

19   BY MR. KNOPP:

20       Q.    Did you use the Punch Communication Log?

21       A.    Yes.

22       Q.    When you used the Punch Communication Log,

23   were you paid for any time that you recorded on the

24   log?

25       A.    Yes.

                                                          88

1    Video Number 2, Volume I, in the deposition of

2    Douglas Troester.  The time is 1:12 p.m.

3    BY MR. KNOPP:

4         Q.   Mr. Troester, did anybody ever -- at

5    Starbucks ever do anything to discourage you from

6    using the Punch Communication Log?

7         A.   Yes.  The company monitored the use of the

8    Punch Commation -- Communication Log and erroneous

9    punches.  And it was discouraged -- excuse me, let

10   me correct that.

11            Any manager or supervisor that did not

12   have proper use of the Punch Communication Log, it

13   was a violation of their standards and procedures.

14   So they could be terminated or whatever depending on

15   the circumstances.

16        Q.   I -- I'm sorry.  What do you mean by "did

17   not have proper use of it"?

18        A.   Well, as you see, it was -- at the top

19   here it says, "This is only supposed to be used for

20   missed punches."  So if anything was not considered

21   a miss punch or there was too many miss punches,

22   then that would -- that would be an issue with the

23   company on how that procedure was handled.

24        Q.   Did anybody ever discipline you in any way

25   for using the Punch Communication Log?

96

1        A.   I don't recall a specific written

2    discipline but there was always encouragement at --

3    at any point to only use this when you missed the

4    punches.

5        Q.   Did anybody discipline you verbally in any

6    way for using the Punch Communication Log?

7        A.   Not in a specific context, but within

8    store meetings, yes.  Not me personally, but it

9    would come up as an issue.

10       Q.   What would come up?

11       A.   That to make sure you use the

12   communication log for missed punches.  This was

13   something that could be caught up after the fact,

14   basically.

15       Q.   What do you mean by that?

16       A.   Well, it somebody knows that a missed

17   punch was missed, you know, literally -- well, I've

18   got you running for 24 hours, but you weren't here.

19   But you didn't fill out the log, what do you do?

20       Q.   What --

21       A.   And I -- I imagine somewhere in those many

22   years of my service, I missed that once or twice.

23   So that would be the extent of it.

24            Now, if you made a routine habit of it,

25   you could be subject to -- just like it said in that

                                                          97

```
 1          Q.    Discouraged from working overtime?

 2          A.    Yes.

 3          Q.    You familiar with the term "off-the-clock

 4    work"?

 5          A.    Yes, I am.

 6          Q.    That's worked performed while you were not

 7    clocked into the timekeeping system, right?

 8          A.    Yes I'm aware of that.

 9          Q.    And when you were employed by Starbucks in

10    California, did the company have a policy regarding

11    off-the-clock work?

12          A.    They do have a policy.

13          Q.    What is your understanding of the policy?

14          A.    As it says in the Partner Guide, there

15    should no be -- not be any off-the-clock work.

16          Q.    Are you familiar with the phrase "time

17    worked equals time paid"?

18          A.    Yes, that's also in the Partner Guide.

19          Q.    And you're familiar with that statement

20    when you worked for Starbucks in California?

21          A.    Yes, I'm aware of the statement.

22          Q.    What is your understanding of what that

23    means?

24          A.    The -- the statement basically says that

25    anything that you're doing for the company should be
```

100

1    paid for.  And you need to follow the procedures and

2    routines to ensure that you're paid for that time.

3         Q.   You understood that the company's policy

4    was that partners should be paid for all the time

5    that they worked?

6         A.   To the point that the policy existed, but

7    there was conflicting policies.

8         Q.   Did you understand that Starbucks' policy

9    was that partners should be paid for all time

10   worked?

11        A.   I understood that, yes.

12        Q.   Did you also understand that the company

13   strictly prohibited off-the-clock work?

14        A.   No, I did not.

15        Q.   I'd like to refer you back to Defendants'

16   Exhibit 9, the Partner Guide, and Page 12 of it.

17        A.   (Witness complies.)  Okay, I'm there.

18        Q.   Do you see in the beginning of the page

19   there's a section entitled "recording time worked"?

20        A.   Yes, I do see that.

21        Q.   The second sentence states, "It is against

22   Starbucks' policy for any nonexempt partner work off

23   the clock or without having punched in or otherwise

24   recording the time as timed worked."

25             Did you understand that that was the

101

1      company's policy?

2             A.    That is one of the policies, but there's

3      another policy in direct violation with that policy.

4             Q.    What's that other policy?

5             A.    That policy has to do with closing-shift

6      procedures.

7             Q.    Okay.  And I'm going to ask you all about

8      that.

9                   Did you understand that Starbucks required

10     its partners to report any work performed off the

11     clock?

12            A.    I did not have a complete understanding of

13     what they would mean by "report."

14            Q.    Okay.  I'm going to refer you back to that

15     same page.  I wasn't quite done with it yet.

16            A.    Oh, okay.

17            Q.    Yeah, page 12 of the Partner Guide.  On

18     the right-hand side of the page near the middle of

19     the page, there's a title "off-the-clock work.  It's

20     strictly prohibited."

21                  You see that?

22            A.    Yes, I do see that.

23            Q.    You understood that that was the company's

24     policy regarding off-the-clock work?

25            A.    I understand that as policy, but again,

102

1    there's policies in conflict.

2         Q.   Okay.  The first sentence of that section

3    states, "If a shift supervisor or manager instructs,

4    encourages or permits a partner to work any amount

5    of time off the clock, the partner must immediately

6    report the violation to the store manager or

7    district manager as appropriate."

8              Do you see that?

9         A.   Yes, I do see that.

10        Q.   And when you were employed by Starbucks,

11   did you understand that that's what the company

12   required of its partners?

13        A.   I understood that at the time I took this

14   course, but it would be very impractical for that to

15   happen.

16        Q.   What do you mean by that?

17        A.   Well, when you consider that there are a

18   minimum by company standards and policies and

19   procedures of two closing --

20        THE REPORTER:  I'm sorry, when you consider

21   there are minimum?

22        THE WITNESS:  That there is a minimum of two

23   employees closing a store at any time --

24        THE REPORTER:  Okay.  Thank you.

25        THE WITNESS:  -- any day -- and sorry, I lost

103

1        A.    That's correct.

2        Q.    Did you take any steps to obtain payment

3   for that time?

4        A.    I believe a missed punch log would have

5   been entered, but I couldn't give you have an exact

6   date and time to verify it.

7        Q.    Do you recall if Starbucks, in fact, paid

8   you for those 30 minutes?

9        A.    Again, I couldn't recall.

10       Q.    You don't remember one way or the other?

11       A.    No.

12       Q.    You can put that document aside.  Thanks.

13             When you worked closing shifts -- let me

14   back up.

15             I'm going to ask you a number of questions

16   now about your experience on closing shifts.  I'm

17   only concerned with your employment in California.

18   Okay?

19       A.    Okay.

20       Q.    So my questions are really focused only on

21   your employment from February 2008 through

22   January 2011.  You understand that?

23       A.    I understand that.

24       Q.    Okay.  When you worked on a closing shift,

25   how many employees in total were typically staffed

                                                      110

1   on that shift?

2       A.   The minimum of two.  Occasionally three.

3       Q.   And would those -- so that's two to three

4   employees including yourself?

5       A.   Yes.

6       Q.   In other words, you and one to two others?

7       A.   That is correct.

8       Q.   And when there were three people working

9   on a closing shift, did all three typically stay the

10  entire shift until the end?

11     MS. SCHWARTZKOPF:  Objection.  Vague and

12  ambiguous as to "stay until the end."

13  BY MR. KNOPP:

14      Q.   Yeah.  I believe it was your testimony

15  earlier that two employees were required to be

16  present?

17      A.   That is correct.

18      Q.   So when you -- when you were the last one

19  to leave the store, there was at least one other

20  person with you, right?

21      A.   That's correct.

22      Q.   Okay.  Was there usually only one other

23  person with you or was there sometimes two other

24  people with you?

25      A.   Sometimes two.

111

1          A.   The -- this procedure is different from

2     the procedure that we had while I was employed

3     there.

4          Q.   Okay.   Was there some process when you

5     were employed by Starbucks, for sending information

6     maintained in the store computers to computers at

7     Starbucks' headquarters?

8          A.   Yes, there was.

9          Q.   And this page in front of you appears to

10    be describing a process like that?

11         A.   That is correct.

12         Q.   Okay.   Why don't you explain the process

13    in effect when you were employed by Starbucks in

14    California.

15         A.   Okay.   To the .1 on here, that is

16    accurate.   Point Number 2 is accurate.   And Point

17    Number 3 is accurate.

18              From there, you started to get some

19    variance.   And I can't be real specific on how it

20    varied, but it was with the introduction of a new --

21    the Symphony software that they said, "The way

22    Symphony works, you now have to clock out first

23    before you did the store-closing procedures."

24              Because the store has to be fully -- or

25    all partners need to be clocked out before Symphony

                                                        130

1    will process correctly.

2        Q.    When you were working for Starbucks in

3    California on a closing shift, one partner was

4    responsible for initiating a process whereby data in

5    the store's computers were sent to computers at the

6    company's headquarters, right?

7        A.    That's correct.

8        Q.    And that process involved running a

9    program on the manager workstation?

10       A.    That's correct.

11       Q.    And as shift supervisor, were you the

12   partner who was responsible for that task?

13       A.    The closing shift supervisor, yes.

14       Q.    And that process involved using the

15   computer's mouse?

16       A.    I can't recall.

17       Q.    Well, one way or another, it involved

18   selecting store close on the main menu of the

19   workstation, right?

20       A.    That's correct.

21       Q.    Either using its keyboard or the mouse?

22       A.    Yeah.  That -- to be fair, it's basically

23   the mouse.  And their system was totally messed up.

24   So likely I used the mouse, yes.

25       Q.    And then you would have to enter a

131

```
 1     to do the batch reporting would have been done --

 2     done before that.

 3          Q.   Now, the store-close procedure is

 4     something that -- it's a procedure that the computer

 5     runs, right?

 6          A.   No.  If you talk to any Starbucks employee

 7     when they talk about store-closing procedures, it

 8     would be the whole litany that you saw in that one

 9     color-graphic book.

10          Q.   Okay.  I'm just trying to understand the

11     part pertaining to the manager workstation.

12          A.   Right.

13          Q.   The computer undergoes a process where it

14     sends data to headquarters, right?

15          A.   That's correct.

16          Q.   And when you were employed by Starbucks,

17     that process needed to be initiated by an employee,

18     right?

19          A.   That's correct.

20          Q.   The computer wouldn't do it automatically?

21          A.   No, it would not.

22          Q.   Okay.  So just focusing on your role in

23     initiating that process, which I think you've now

24     described, right?

25          A.   Uh-huh.
```

135

1    off-the-clock work you performed on closing shifts

2    continued right up until your termination?

3        A.   That is correct.

4        Q.   Okay.  Are you aware that at some point in

5    time, Starbucks implemented a new computer operating

6    system called Symphony?

7        A.   I've testified to that, yes.

8        Q.   Okay.  And am I right that the Hollywood

9    Way store began using Symphony in November 2010?

10       A.   I don't believe so.

11       Q.   Are you aware that under Symphony, the

12   store-close process on the manager workstation was

13   eliminated?

14       A.   No.

15       Q.   Are you aware that once Symphony was

16   implemented, the store computer would automatically

17   send the data to Starbucks' headquarters without any

18   prompting by an employee?

19       A.   I would say I infer that from these

20   proceedings.

21       Q.   I'm not trying to trick you.

22       A.   Okay.

23       Q.   I just want to know what you know.

24       A.   I don't know anything about the current

25   operations of Symphony.

                                              144

1          Q.   Okay.   Are you aware that once your store

2     began using the Symphony operating system, the

3     computers would automatically run this process and

4     it would not be initiated by an employee?

5          THE WITNESS:   Could you read that back to me

6     again, please?

7               (The requested testimony was read back)

8          THE WITNESS:   No.   I'll also state that didn't

9     happen when it was in there.

10    BY MR. KNOPP:

11         Q.   When you say "that didn't happen when it

12    was in there," you're referring to Symphony?

13         A.   Yes, I am.

14         Q.   So it's your testimony that the process

15    whereby date was sent from the store to headquarters

16    was pretty much the same after Symphony was

17    implemented?

18         A.   Yes.   Throughout all the stores, it was

19    the same, yes.

20         Q.   I'm just asking about your store.

21         A.   Yes.

22         Q.   You can put that aside for a moment.

23         A.   (Witness complies.)

24         Q.   I believe you testified earlier that once

25    the alarm was activated, the partners had to leave

                                                        145

1              Do you see that?

2         A.   Yes, I do.

3         Q.   And beneath that, there's a subsection

4    entitled "user tips."

5              Do you see that?

6         A.   Yes, I do.

7         Q.   You see the second bulletpoint?

8         A.   Yes, I do.

9         Q.   It states, "The standard setup is a

10   45-second delay upon entry to disarm and 45-second

11   delay to exit the store after arming."

12             Does that refresh your recollection as to

13   how long you had to exit the store after arming the

14   alarm?

15        A.   No, it does not.

16        Q.   You think it was different?

17        A.   Not necessarily, but that says it's a

18   standard.  My recollection is it was longer.

19        Q.   Do you contend that you performed any work

20   for which you should be paid after setting the

21   alarm?

22        A.   Yes, I do.

23        Q.   What work?

24        A.   As outlined in these opening and closing

25   responsibilities that you provided, you will see arm

147

1    the alarm system and then you have three

2    bulletpoints after that.

3            So to -- to go to answer that, you know,

4    this is -- the standard procedures during my

5    employment vary from what this document is -- is

6    saying.

7        Q.   What is the work you say you performed

8    after arming the alarm?

9        A.   Leaving the store with all partners.

10   Ensure that all doors are locked when leaving.  Walk

11   the partners to their vehicle.  And those are not

12   just within the standard.  That's a broad definition

13   of those.  To give you an example --

14       Q.   I want to know all of it.

15       A.   Okay.  To give you an example, walking in

16   the partners to their vehicle, that was a safety and

17   security issue.  That meant if somebody was waiting

18   for a ride from their parents, then you had to

19   actually wait with that second partner or usually a

20   third partner at that point, because it's not likely

21   that three partners would have to wait for their

22   parents or something.  Especially with me, I had my

23   own vehicle.

24           But that would have been an example that I

25   had several times where I actually had to wait with

148

1    Q.   Okay.  I want to ask you questions about

2    everything you identified.  You said leaving the

3    store, you regard that as work for which you should

4    be paid?

5    A.   I regard that and Starbucks regards it, by

6    way of the definition in the document here.

7    Q.   Okay.  How long did it take you to leave

8    the store after arming the alarm?

9    A.   Would you like to clarify that some more?

10   Q.   How long did it take you to leave the

11   store after arming the alarm?

12   A.   If you're asking the question of where I

13   am -- basically left from Starbucks' premises.

14   Q.   How long did it take you to exit the store

15   after arming the alarm?

16   A.   Okay.  I believe you're asking that if --

17   if it was literally how long would it take to exit

18   after I got the code signal that the alarm is set?

19   Q.   Right.

20   A.   Probably 30 seconds to walk to the door.

21   Q.   And you claim you should be paid for that?

22   A.   Yes.  Again, as it's outlined in the

23   procedure manual.

24   Q.   Does this procedural manual say you should

25   be paid for walking to the door?

150

```
 1              A.    Yes, because that has ensured all doors

 2       are locked and leave the store with the partners.

 3       So it covers both of those areas.

 4              Q.    Okay.   I'm going to get to that.   Right

 5       now --

 6              A.    Okay.

 7              Q.    -- I'm just asking about leaving to the

 8       store with all partners.

 9              A.    Okay.

10              Q.    And the other partners on the shift were

11       already waiting by the door, correct?

12              A.    Yes.

13              Q.    And usually it's just one other person,

14       right?

15              A.    Yes.

16              Q.    "Ensure that all doors are locked when

17       leaving."  You had to do that before the alarm was

18       activated, right?

19              A.    In addition to, yes.

20              Q.    Okay.   And then after the alarm was

21       activated, you had a minute to get out of the store,

22       right?

23              A.    At least.

24              Q.    And what would you do in terms of ensuring

25       that the doors are locked after the alarm is
```

151

1    activated?

2         A.   From the point where the partner and I

3    were now standing outside the door, I would use the

4    key to secure the door, normal function.   Then I

5    would -- would rattle and shake the door a couple of

6    times just to make sure everything latched.

7         Q.   And how long did it take you to lock the

8    door and then rattle it?

9         A.   That could range from 15 minutes -- excuse

10   me -- 15 seconds, which would be, you know, no

11   problems, no concerns, I would say, to the point

12   where I mentioned before in the testimony, there was

13   a sticky door, that could be 30 seconds to couple

14   minutes.

15        Q.   A couple minutes to make sure that the

16   door was locked?

17        A.   Yes.   Because the door had some serious

18   problems until they actually got it fixed and -- I'm

19   done answering that question.

20        Q.   The other partner present with you was

21   free to leave at that point, right?

22        A.   Absolutely not.

23        Q.   The other partner present with you had to

24   stay until when?

25        A.   Until we were all walking out to the

152

1    vehicles together or to whatever final destination

2    point, if they didn't have a vehicle, like their

3    parent's car or something of that nature.

4         Q.   The front door of your store opened to a

5    parking lot?

6         A.   Yes.

7         Q.   People who worked at Starbucks parked at

8    the parking lot?

9         A.   Yes.

10        Q.   And was it your practice to actually walk

11   partners to their vehicles?

12        A.   Absolutely.

13        Q.   How long did it take you to walk somebody

14   to their vehicle?

15        A.   The parking lot is a normal, large, busy

16   airport-style parking lot with -- well, roughly

17   seven or eight food service vendors in that area and

18   enough parking for everybody.  So it was a large

19   parking lot.

20             And we were required to park on the

21   outskirts and not have customer -- due to customer

22   convenience, not close to the store.  So it would be

23   about 35 to 45 seconds.

24        Q.   When you were not the closing shift

25   supervisor, did somebody walk you to your car?

153

1          Q.    Did you work with any colleagues who rode

2     their bikes to work?

3          A.    Yes.

4          Q.    Where would you part ways with them?

5          A.    I can't recall a closing person ever

6     riding their bike, but there was definitely some mid

7     shift people that did.

8          Q.    You mentioned that sometimes after setting

9     the alarm and locking the door, you discovered that

10    the patio furniture was still outside?

11         A.    That's correct.

12         Q.    How frequent did that happen?

13         A.    If I had to quantify, maybe once every

14    couple of months for that specific one.

15         Q.    In that circumstance, would you unlock the

16    door, right?

17         A.    That's correct.

18         Q.    Then would you deactivate the alarm,

19    correct?

20         A.    That is correct.

21         Q.    Then you'd bring the patio furniture

22    inside, right?

23         A.    Yes.

24         Q.    Did you record the time it took you to do

25    that on the Punch Communication Log?

157

1          A.    No.

2          Q.    Why not?

3          A.    Because basically a function of that we

4     did not miss the punch already, we're just doing the

5     final let's-go-home procedures.

6          Q.    Is that any different in your mind than

7     the occasions when you arrived at the store and

8     helped a customer before clocking in?

9          A.    Yes, it is.

10          Q.    How so?

11          A.    Because the situation with the customers

12     would be -- say I was supposed to report at 11:00.

13     While I would walk into the store approximately

14     1:00, I was known for not being late.   Always on

15     time.   And then at some point, the conversation

16     would take me past the point where I would

17     conveniently go and punch in.

18                So say I was talking to somebody about

19     buying some coffee for 15 minutes, well, I've missed

20     my chance to do a punch, so since I missed a punch,

21     then I would use the missed-punch log to take care

22     of that.

23                Whereas, the difference is -- the other

24     way is, you know, the punch is already recorded in

25     the computer, so I didn't have a missed punch.

158

```
 1              A.   That's correct.

 2              Q.   I'd like to refer you back to Defendants'

 3    Exhibit 17.

 4              A.   Okay.  You're holding 16.

 5              Q.   I know.

 6              A.   Okay.

 7              Q.   And Page 4.34.

 8              A.   Okay.

 9              Q.   Do you see .7?

10              A.   Yes.

11              Q.   It states in part, "Partners can punch out

12    using the POS registers, but the MWS cannot be

13    used."

14                   Did you understand that even after the

15    computer process was initiated, partners could still

16    punch out using the POS registers?

17              A.   No, I did not understand that.

18              Q.   Did anybody ever tell you that that was

19    not the case?

20              A.   Yes.

21              Q.   Who told you that?

22              A.   It would more than likely be originally in

23    the training, Marianna Vitali and then the store

24    managers also would go over that again, after the

25    training --
```

168

1          Q.    Okay.

2          A.    -- on-the-job coaching.

3          Q.    It's your testimony that you talked to

4     Ms. Vitali about when to clock out in relation to

5     initiating the computer function?

6          A.    No, I did not talk to her.  It was trained

7     that this is how the new computer works.

8          Q.    The new computer system?

9          A.    Yes.

10          Q.    Okay.  Was there an old computer system

11    where you could clock out after initiating the

12    computer function?

13          A.    I don't remember the exact sequence of the

14    old computer system.

15          Q.    So it's possible under the old computer

16    system that you could clock out after initiating the

17    computer function?

18          A.    It's possible.

19          Q.    And when was that old system replaced?

20          A.    It was -- as I said, I -- I -- pretty sure

21    was earlier than November of 2010.

22          Q.    Well, what's your best recollection?

23          A.    Early summer.

24          Q.    Of 2010?

25          A.    Yes.

1        Q.   So prior to the summer of 2010, it's

2   possible that you clocked out immediately before

3   setting the alarm?

4        A.   Yeah.   The term "immediately" is a little

5   bit vague, but yes, very close to it is what I'd

6   use.

7        MS. SCHWARTZKOPF:   Counsel, can we take a very

8   short break, like one minute?

9        MR. KNOPP:   Sure.

10       THE VIDEOGRAPHER:   This -- this marks the end

11  of Videotape Number 2, Volume I, in the deposition

12  of Douglas Troester.   Going off the record.   Time is

13  3:20 p.m.

14                  (A break was taken)

15       THE VIDEOGRAPHER:   This marks the beginning of

16  Videotape Number 3, Volume I, in the deposition of

17  Douglas Troester.   Going on the record.   Time is

18  3:24 p.m.

19       THE WITNESS:   I'd like to make a clarification

20  at this point.   The -- my memory -- the best of my

21  memory, it was September -- excuse me -- summertime

22  of 2009, a much longer period for all these changes

23  and how the procedures were handled.

24           I'm not familiar with why there would be a

25  discrepancy.   But to the best of my recollection, it

171

1    was a much longer period that we had to clock out

2    first and then do the action on the terminal.

3    BY MR. KNOPP:

4          Q.    Okay.   Let me -- let me clarify now.   So

5    prior to summer of 2009, the computer system was

6    somehow different?

7          A.    There was constantly updates throughout

8    the time frame of my employment at Starbucks.

9          Q.    Okay.   Prior to the summer of 2009 as far

10   as you remember, you could clock out after

11   initiating the computer function?

12         A.    And again, I'm vague on what the procedure

13   was before that.

14         Q.    Okay.

15         A.    I just remember a change around 2009 --

16   summer of 2009 and -- in the way we handled the

17   computer system.

18         Q.    So your testimony is that starting around

19   the summer of 2009, you began clocking out before

20   initiating the store-close computer process?

21         A.    At the manager's workstation, that's

22   correct.

23         Q.    Now, do you have any understanding as to

24   whether the system required that you clock out

25   first?

172

```
 1          A.   Whatever instigated the change, it was

 2   handed through the management chain in forms of

 3   training and verbal words that, "Yes, there's a

 4   change happening and you need to be sure that you're

 5   clocked out first."

 6          Q.   So this is what the managers informed you?

 7          A.   Yes.

 8          Q.   But do you know whether -- whether the

 9   system required that you do it that way?

10          A.   I would have to take them at their word

11   and say that it was required.  It sure seemed that

12   way from me understanding computers.  I didn't try

13   to investigate my own method of store closing.  That

14   would be inappropriate.

15          Q.   And did you know it worked this way as you

16   described it, in other stores besides Hollywood Way?

17          A.   Yes.

18          Q.   That's because you worked closing shifts

19   at other stores?

20          A.   Yes.

21          Q.   And you specifically recall this?

22          A.   Yes.

23          Q.   And it's your recollection that the

24   process whereby you clocked out before initiating

25   the computer function continued through the end of
```

173

1     your employment?

2          A.   Yes.

3          Q.   And from the moment you began this process

4     of initiating the computer program to the moment

5     where you activated the alarm, took how long?

6          A.   That would be a variable.  Ideally as

7     quickly as possible.  But say two or three minutes.

8          Q.   And that's in the post summer of 2009

9     period, right?

10         A.   Yes.

11         Q.   When you clocked out on closing shifts,

12    did you do that at the computer terminal in the back

13    of the house or at one of the POS terminals?

14         A.   During my time of employment by Starbucks,

15    it was always on the POS terminals.

16         Q.   Near the front of the house?

17         A.   Yes.

18         Q.   And was that true for the other partners

19    you worked for as well?

20         A.   Yes.

21         Q.   And is it your understanding that the

22    other partners in the post summer 2009 period, also

23    clocked out before you began the process of

24    initiating the computer program?

25         A.   And before the end of my employment?

174

```
 1    And she not back with Michelle Westby and said,

 2    "Doug was not appropriately dressed for this."  But

 3    it was totally in compliance with the procedures.

 4             Those are a couple definite circumstances

 5    and I could provide more, if need be.

 6        Q.   In the complaint you allege that the wage

 7    statements you received were inaccurate because they

 8    didn't reflect pay for these off-the-clock hours,

 9    right?

10        MS. SCHWARTZKOPF:  Objection.  Calls for a

11    legal conclusion.

12             You can answer to the extent it's outside

13    of our communications.

14    BY MR. KNOPP:

15        Q.   Are you aware that you're making that

16    claim in this lawsuit?

17        A.   Yes.

18        Q.   Did I accurately describe the reason you

19    think the pay statements were inaccurate?

20        A.   No, not --

21        Q.   What -- what other reason you think the

22    pay statements were inaccurate?

23        MS. SCHWARTZKOPF:  Objection.  May call for a

24    legal conclusion.

25             You can answer to the extent that you know
```

                                                        192

1    and not based on our conversations.

2        THE WITNESS:  If you take the entirety of the

3    testimony I made today, that would be my beliefs and

4    understanding.

5    BY MR. KNOPP:

6        Q.   My understanding of your claim is that the

7    pay statements are inaccurate because they didn't

8    reflect the pay you earned, but never received?

9        A.   I think that's a fair statement.

10       Q.   I got it right?

11       A.   Yes.

12       Q.   Okay.  Do you contend that you've been

13   injured in any way as a result of inaccuracies in

14   the pay statements?

15       MS. SCHWARTZKOPF:  Same objections.  It calls

16   for a legal conclusion.  He's not an attorney and

17   he's not required to know the law.

18           But can you answer.

19   BY MR. KNOPP:

20       Q.   You can answer.

21       A.   I don't have some pay that I was entitled

22   to so, yes.

23       Q.   You feel like you've been harmed in any

24   other way, besides what you just described?

25       MS. SCHWARTZKOPF:  Same objections.

1          THE WITNESS:  Not that I can think of at the

2     moment.

3          MR. KNOPP:  I don't think I have anymore

4     questions, but I just want to take a few minutes to

5     confirm.  So why don't we go off the record for a

6     few minutes.

7          THE VIDEOGRAPHER:  Going off -- going off the

8     record.  Time is 3:55 p.m.

9                    (A break was taken)

10         THE VIDEOGRAPHER:  Going on the record.  The

11    time is 4:06 p.m.

12         MR. KNOPP:  I have no further questions.  Thank

13    you.

14         MS. SCHWARTZKOPF:  Thank you.

15         THE REPORTER:  Do you need a copy?

16         MS. SCHWARTZKOPF:  Yes, please.

17         THE REPORTER:  Okay.

18         THE VIDEOGRAPHER:  This is the end of Videotape

19    Number 3, Volume I, in the deposition of Douglas

20    Troester.  Going off the record.  Time on the

21    monitor is 4:07 p.m.

22

23     (The deposition proceedings concluded at 4:07 p.m.)

24

25

                                                       194